# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHRISTOPHER CHOPKO,** | : | **Civil No.  1:22-CV-121** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI**, | : | |
| **Acting Commissioner of Social Security** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The Supreme Court has underscored for us the limited scope of our

substantive review when considering Social Security appeals, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

Christopher Chopko applied for disability benefits and supplemental security income under Titles II and XVI of the Social Security Act on August 16, 2019, alleging an onset date of disability of July 24, 2019. A hearing was held before an Administrative Law Judge ("ALJ"), and the ALJ found that Chopko was not disabled during the relevant period and denied Chopko's application for benefits. Chopko now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence.

However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.   **Statement of Facts and of the Case**

Chopko filed his claim for disability benefits and supplemental security income on August 16, 2019, alleging an onset date of July 24, 2019. (Tr. 15). Chopko alleged disability due to the following impairments: depression, psychotic episodes, schizophrenia, back surgery, insomnia, anxiety, panic attacks, and psychosis. (Tr.

2

266). He was 35 years old at the time of his alleged onset of disability, had at least a high school education, and had past relevant work experience as a hand packer. (Tr. 23).

With respect to Chopko's impairments,[1] the medical record revealed the following: In July of 2019, Chopko was admitted to Geisinger Community Medical Center after he was brought in by the Archbald Police for a crisis evaluation. (Tr. 659). At this time, he admitted to having suicidal and homicidal ideations. (Tr. 660). During his assessment, Chopko stated that he believed he was being used as an experiment by the government, and that he was having trouble with his supervisors at work. (Tr. 662). The day prior to his discharge, he reported feeling less anxious and that he was able to focus on conversation and respond appropriately. (Tr. 700). On July 23, 2019, when Chopko was discharged, he denied thoughts of self-harm and harm to others, and he was given medications for his anxiety, depression, and psychotic symptoms. (Tr. 704-05).

Chopko was again admitted to Geisinger on August 1, 2019, after he called the police and reported himself because of his psychotic symptoms. (Tr. 706). He reported intrusive thoughts of hurting other people, predicting events before they

---

[1] At the administrative hearing, Chopko's counsel conceded that he was proceeding with his claim based on his mental impairments alone. (Tr. 39).

happened, and feelings of being manipulated by sinister forces. (Id.) He also reported auditory hallucinations, paranoia, anxiety, and restlessness. (Id.) It was noted that Chopko was paranoid about being a test subject of the government, and that he was constantly restless. (Tr. 616). It was further reported that he quit his job as a security guard at that time because he was driving around all day and was "bored." (Id.) At this time, he was diagnosed with unspecified schizophrenia and alcohol use disorder. (Tr. 622). Chopko was discharged on August 8, 2019. (Tr. 658).

Thereafter, Chopko was evaluated for schizophrenia at The Aaron Center. (Tr. 798-810). It was noted that Chopko began experiencing symptoms of anxiety and paranoia following his divorce in 2016, and that these symptoms impacted his ability to keep a job. (Tr. 799). It was further noted that at this time, Chopko was making efforts to avoid drinking and drug use. (Tr. 800). Regarding his mental health, Chopko reported vivid visions of hurting other people in disturbing ways. (Tr. 801). A mental status examination revealed that Chopko's appearance was within normal limits; he was cooperative toward the examiner and oriented to person, place, and time; he had logical thought processes and his speech was clear; his thought content was within normal limits, although he referenced delusions and reported auditory hallucinations; his insight, judgment, and concentration were within normal limits; and he reported no homicidal or suicidal ideations. (Tr. 802-04). Chopko was

4

diagnosed with paranoid schizophrenia and generalized anxiety disorder. (Tr. 806).

He was given medication and referred to outpatient counseling. (Tr. 807-08).

Chopko began treating at the Scranton Counseling Center in September of 2019. (Tr. 814). On examination, Chopko was cooperative, his speech was normal, he had an anxious and depressed mood, a flat affect, and coherent thought processes. (Id.) His memory was intact, and he had fair insight and judgment, as well as adequate concentration. (Tr. 814-15). A progress note from February of 2020 indicates that Chopko's anxiety was high and accompanied by heart palpitations. (Tr. 817). He reported having panic attacks when he is feeling paranoid but admitted that he was able to distinguish his delusional thinking from reality, although it was stressful for him. (Id.)

At a follow-up visit in March of 2020, Chopko reported that he was working at a convenience store 30 hours per week. (Tr. 822). He further reported that his psychotic symptoms had decreased since his medication was increased, and that his anxiety was well controlled on his medications. (Id.) Chopko also stated that his depressed mood was improving and denied any suicidal or homicidal thoughts. (Id.) A mental status examination revealed a euthymic mood, linear thought process, normal speech, adequate concentration, and fair judgment and insight. (Tr. 822-23). A June 2020 appointment revealed that Chopko had lost his most recent job due to

5

social anxiety. (Tr. 942). A mental status examination revealed similar findings of normal speech, euthymic mood, appropriate affect, coherent thought processes, and adequate concentration. (Tr. 943). In July of 2020, Chopko was seen in the emergency room after reporting he was hearing voices and having suicidal thoughts. (Tr. 956). He was discharged the same day and advised to follow up with any new or worsening symptoms. (Tr. 961).

Progress notes from Scranton Counseling in August of 2020 indicate that Chopko was "doing fine" since his ER visit, and that he was working a security guard job part-time. (Tr. 946). He reported that he was able to manage his anxiety and did not want to change his medications. (Id.) At a follow up visit in October of 2020, it was noted that Chopko continued to have panic attacks and slight depressive symptoms but was doing part-time security work. (Tr. 951). On examination, Chopko was cooperative, his speech was normal, mood was euthymic, affect was appropriate, and his thought processes were coherent. (Tr. 951-52).

It is against this medical backdrop that the ALJ held a telephonic hearing on Chopko's claim on November 17, 2020. (Tr. 31-65). At the hearing, both Chopko and a Vocational Expert testified. (Id.) By a decision dated January 13, 2021, the ALJ denied Chopko's application for benefits. (Tr. 12-25).

In that decision, the ALJ first concluded that Chopko met the insured status requirements under the Act through December 31, 2024, and he had not engaged in any substantial gainful activity since his alleged onset date of July 24, 2019. (Tr. 18). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Chopko had the following severe impairments: schizophrenia, major depressive disorder with psychotic features, and alcohol use disorder. (Id.) At Step 3, the ALJ determined that Chopko did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 18-19).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Chopko's limitations from his impairments:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can perform jobs that would take no more than 30 days of training to learn with a specific vocational preparation (SVP) level of two or less, which are generally classified as unskilled. The claimant can perform jobs that would be considered low stress in that they would involve only occasional simple decision making and only occasional, gradual changes in the work duties and work setting. The claimant can have only occasionally interaction with coworkers and supervisors but would be limited to no more than rare/incidental contact with customers or members of the general public.

(Tr. 20).

Specifically, in making the RFC determination, the ALJ considered the medical evidence, medical opinions, and Chopko's testimony regarding his impairments. On this score, the ALJ considered the opinions of the state agency consulting sources, Dr. Roberts and Dr. Taren. Dr. Roberts opined in November of 2019 that Chopko could understand, retain, and follow simple instructions (*i.e.*, perform one- and two-step tasks); could make simple decisions and perform simple, routine tasks in a repetitive environment; and was capable of asking simple questions and accepting instruction. (Tr. 100). On reconsideration, Dr. Taren opined in June of 2020 that Chopko had the same limitations as stated by Dr. Roberts. (Tr. 141). The ALJ found these opinions persuasive, in that they were consistent with the overall record. (Tr. 23). The ALJ further noted that Chopko had worked several jobs since his alleged onset date, including at the time of the administrative hearing, and that Chopko's mental health impairments were noted to be worse when he was noncompliant with treatment and abusing alcohol. (Id.)

The ALJ also considered Chopko's testimony but ultimately found that Chopko's complaints were not entirely consistent with the medical evidence of record. (Tr. 21-22). Chopko testified that he lived with his parents and had not consumed alcohol for roughly one year; that he was working one day per week as a security guard at the time of the hearing; that he experienced panic attacks,

hallucinations, nightmares, and distorted thinking; and that he saw a therapist once per month. (Tr. 41-42, 48-53). He further stated that he was compliant with his medications, that he had panic attacks twice per week, and that at times, he thought his coworkers were out to get him and were watching him. (Id.)

The ALJ ultimately found that Chopko's complaints were not entirely consistent with the medical record. That record showed that, although he was hospitalized twice in 2019, his symptoms decreased significantly when he was not abusing alcohol and when he was compliant with his medications. (Tr. 22). The ALJ further noted that Chopko's activities of daily living, while somewhat limited, suggested that Chopko could perform work on a sustained and continuous basis. (Id.) On this score, the ALJ noted that Chopko was able to drive, do household chores, and perform personal care activities, and that he had been working during the relevant period and had not missed work due to his mental impairments in the past four months prior to the hearing. (Id.)

Having arrived at this RFC assessment, the ALJ found at Step 4 that Chopko could perform his past relevant work as a hand packer. (Tr. 23). The ALJ then made a further finding at Step 5 that Chopko could perform work available in the national economy as a vehicle cleaner, janitor, and mail sorter. (Tr. 24). Accordingly, the

ALJ concluded that Chopko did not meet the stringent standard for disability set by the Act and denied his claim. (Tr. 24-25).

This appeal followed. (Doc. 1). On appeal, Chopko contends that the ALJ failed to account for a limitation to one- to two-step tasks as opined by the state agency consultants. Additionally, Chopko asserts that the RFC determination exceeds all of the medical opinions of record, and thus, cannot be supported by substantial evidence. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.   Discussion

### A.    Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla.

Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence.

Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").  20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)."  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1).  In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal

15

requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic

16

view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C.   **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application in August of 2018 after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were

enjoined to consider were broadened substantially, and the approach to evaluating

opinions was changed from a hierarchical form of review to a more holistic analysis.

As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see
> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner
> must consider all medical opinions and "evaluate their persuasiveness"
> based on the following five factors: supportability; consistency;
> relationship with the claimant; specialization; and "other factors." 20
> C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).
>
> Although the new regulations eliminate the perceived hierarchy of
> medical sources, deference to specific medical opinions, and assigning
> "weight" to a medical opinion, the ALJ must still "articulate how [he
> or she] considered the medical opinions" and "how persuasive [he or
> she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and
> (b)(1), 416.920c(a) and (b)(1). The two "most important factors for
> determining the persuasiveness of medical opinions are consistency and
> supportability," which are the "same factors" that formed the
> foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg.
> 5844-01 at 5853.
>
> An ALJ is specifically required to "explain how [he or she] considered
> the supportability and consistency factors" for a medical opinion. 20
> C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to
> "supportability," the new regulations provide that "[t]he more relevant
> the objective medical evidence and supporting explanations presented
> by a medical source are to support his or her medical opinion(s) or prior
> administrative medical finding(s), the more persuasive the medical

opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision

20

is accompanied by an adequate, articulated rationale, it is the province and the duty

of the ALJ to choose which medical opinions and evidence deserve greater weight.

> Further, in making this assessment of medical evidence:
>
> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D.   Simple Tasks RFC Analysis

In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the United

States Court of Appeals addressed the question of whether an RFC which limited a

claimant to simple tasks adequately addressed moderate limitations on

concentration, persistence, and pace. In terms that are equally applicable here, the

Court noted that "[t]he relationship between 'simple tasks' limitations and

21

'concentration, persistence, or pace' is a close one." Id. Given how closely related these two concepts are, the appellate court rejected the notion advanced by the plaintiff that an RFC which limited a claimant to simple tasks failed as a matter of law to address moderate limitations on concentration, persistence, and pace. Instead, the Court concluded that:

> A limitation to "simple tasks" is fundamentally the same as one "to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]" (App. at 33-34;) see Davis v. Berryhill, 743 F. App'x 846, 850 (9th Cir. 2018) (treating "understanding, remembering, and carrying out only simple instructions" as equivalent to "simple tasks"); Richards v. Colvin, 640 F. App'x 786, 790 (10th Cir. 2016) (referring to a limitation "to understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions" as a "simple-work limitation[ ]"). Indeed, both formulations — the ALJ's and the more concise phrase "simple tasks" — relate to mental abilities necessary to perform "unskilled work." See 20 C.F.R. §§ 404.1568(a), 416.968(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."); SSR 96-9P, 1996 WL 374185, at *9 (July 2, 1996) (concluding that "unskilled work" requires "[u]nderstanding, remembering, and carrying out simple instructions" and "[m]aking ... simple work-related decisions"); cf. Richards, 640 F. App'x at 790 (treating "simple-work limitations" as similar to "unskilled work" limitations). So the parties' reliance on case law related to "simple tasks" is appropriate and helpful.

Hess, 931 F.3d at 210–11.

Having rejected a *per se* rule finding that simple task RFCs are legally inadequate to address moderate limitations in concentration, persistence, and pace, the Court of Appeals found that, in this setting, the issue was one of adequate

articulation of the ALJ's rationale, holding that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " Id. at 211. On this score, the appellate court indicated that an ALJ offers a valid explanation for a simple task RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, which demonstrated that [s]he is capable of engaging in a diverse array of 'simple tasks[.]'" Id. at 214.

### E.  The ALJ's Decision is Supported by Substantial Evidence.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Chopko was not disabled.

Therefore, we will affirm this decision.

At the outset, Chopko contends that the ALJ erred when he failed to include a limitation to one- to two-step tasks in the RFC assessment. Chopko asserts that the ALJ's failure to include this limitation, as well as the failure to explain why this limitation was excluded, amounts to error that requires remand. However, Chopko relies on pre-<u>Hess</u> caselaw to support his assertions that a limitation to unskilled work is not equivalent to a "simple tasks" limitation. As we have explained, the <u>Hess</u> court did, in fact, equate "unskilled work" with a limitation to "simple tasks." <u>Hess</u>, 931 F.3d at 210-11 ("A limitation to 'simple tasks' is fundamentally the same as one 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions'") (citations omitted). <u>See also</u> 20 C.F.R. § 404.1568(a) ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time"); <u>C.S. v. Comm'r of Soc. Sec.</u>, 2021 WL 5195702, at *7 n.3 (D.N.J. Nov. 9, 2021); <u>Gaydosh v. Comm'r of Soc. Sec.</u>, 2020 WL 5084016, at *1 n.1 (W.D. Pa. Aug. 26, 2020); <u>Starr v. Saul</u>, 2020 WL 1975080, at *16 n.40 (E.D. Pa. April 24, 2020).

In the instant case, the ALJ limited Chopko to jobs with an SVP level of two or less and require no more than 30 days of training, which are generally classified

as unskilled, in addition to a limitation that Chopko could perform jobs that involve only occasional simple decision making and only occasional, gradual changes in the workplace. Moreover, the ALJ gave a valid explanation for this limitation, specifically referencing the treatment notes and that the fact that plaintiff's symptoms decreased with medication compliance and when he stopped drinking alcohol. See Soto v. Saul, 2021 WL 613831, at *10 (D.N.J. Feb. 17, 2021) (finding that a limitation to unskilled work and simple tasks, coupled with a discussion regarding medication compliance, was sufficient to explain the plaintiff's limitation in concentration, persistence, and pace). Thus, we find that the ALJ's limitation to "unskilled work" adequately accounts for the finding of a moderate limitation in concentration, persistence, and maintaining pace.

In a similar vein, Chopko argues that the ALJ erred in the RFC determination because the RFC exceeded the only two medical opinions of record. On this score, Chopko contends that because both opinions limited him to one- to two-step tasks, and the ALJ did not account for that limitation, the RFC exceeded the opinions and was not supported by substantial evidence. At the outset, we note that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled

generally to credit parts of an opinion without crediting the entire opinion." <u>Durden</u>, 191 F.Supp.3d at 455. Finally, when there is no evidence of any credible medical opinion supporting a claimant's allegations of disability it is also well settled that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

In the instant case, as we have discussed with respect to the plaintiff's <u>Hess</u> argument, we find that the ALJ's limitation to unskilled work adequately accounted for Chopko's limitation to simple tasks by the two state agency consultants. Accordingly, we cannot conclude that this RFC determination exceeded these opinions; rather, the ALJ found these opinions persuasive and accounted for those limitations in defining Chopko's RFC. Therefore, we find that substantial evidence supports the ALJ's RFC determination in this case.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med.</u>

Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.   **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.


*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: February 9, 2023